**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TERRANCE THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.  07 C 1130 |
| v. | ) | |
| | ) | Judge Guzman |
| CITY OF CHICAGO, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

## **PLAINTIFF'S RULE 59 MOTION FOR A NEW TRIAL**

Now comes Plaintiff, TERRANCE THOMPSON, by his attorneys, moving this

Honorable Court for a new trial pursuant to Federal Rule of Civil Procedure 59.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii-iv

INTRODUCTION ........................................................................................ 1

I.    FACTUAL BACKGROUND ................................................................ 1

    A.    Thompson's Arrest ................................................................... 2

    B.    Thompson's Conviction ............................................................ 3

    C.    Thompson's Conviction Vacated .............................................. 3

    D.    Defendants' Assert The Fifth Amendment ................................ 4

II.    THE LEGAL STANDARD ............................................................... 4

III.    ARGUMENT .................................................................................. 6

    A.    ALL EVIDENCE RELATING TO THE DUE PROCESS AND CONSPIRACY CLAIMS AGAINST DEFENDANTS McDERMOTT AND BURZINSKI WAS IMPROPERLY EXCLUDED ............................................................ 6

        1.    The Exclusion of All Evidence of Other Incidents of Misconduct By Defendants McDermott and Burzinski Substantially Affected the Outcome of the Claims Against These Officers ...................................... 8

            (a)    The Testimony of Former SOS Officer Villareal Regarding The May 17, 2005 Incident Should Have Been Admitted ................ 8

            (b)    The Testimony of Michael Temple That Defendant Burzinski Planted A Gun On Him Should Have Been Admitted ............. 11

            (c)    Testimony from Rafael Vergil About Burzinksi's and McDermott's Involvement in Misconduct with Officer Finnigan Should Have Been Admitted .............................. 13

            (d)    Testimony from Donald Wisneiewski About Burzinksi's and McDermott's Involvement in Misconduct with SOS Officers Suchocki, Finnigan, Rice and McGovern Should Have Been Admitted ................................................................ 14

        2.    The Exclusion of the Evidence That Would Have Established the Widespread Practices of the SOS Unit Generally ........................... 15

(a)    The Excluded Evidence of the Testimony of SOS Officers Who Participated in the Pattern of Misconduct ……………………… 15

(b)    The Relevance of This Highly Probative Evidence Was Not Outweighed By Its Probative Value …………………………… 17

(c)    The Guilty Plea Testimony Regarding Stops of Citizens Without Probable Cause Are Relevant to Establishing the SOS Pattern of Misconduct ………………………………… 18

(d)    The Guilty Plea Testimony Regarding Incidents of Stealing Are Relevant to Establishing the SOS Pattern of Misconduct ……… 19

(e)    The Post-2003 Incidents Are Relevant to Plaintiff's Due Process and Conspiracy Claims ………………………... 19

C.    DEFENSE COUNSEL'S IMPROPER QUESTIONING AND ARGUMENT SUBSTANTIALLY AND DETRIMENTALLY AFFECTED THE OUTCOME OF PLAINTIFF'S MALICIOUS PROSECUTION CLAIM …………………... 21

1.    The Reference To The Unexplained Indictments ……………………… 22

(a)    The Court's Rulings on the Indictments ….……………………… 22

(b)    Defendants' Violation of the Court's Ruling …………………... 22

2.    Defendants' Improper Questioning And Argument Regarding "Indicative Of Innocence" …………………………………………………….. 24

3.    Defendants' Improper Questioning Allowed Them To Make The Misleading Argument Suggesting That The Officers' Assertions of The 5th Amendment and The Dismissal of the Criminal Charges Against Plaintiff Had Nothing To Do With Mr. Thompson ……………………………... 26

V.    The Admission of Plaintiff's 11 Alias Names Was Unfairly Prejudicial and Should Not Have Been Allowed …………………………………………….. 29

CONCLUSION …………………………………………………………………… 32

# TABLE OF AUTHORITIES

**Cases**          **Page**

*Adams Lab., Inc. v. Jacobs Engineering Co., Inc.,* 761 F.2d 1218 (7th Cir. 1985) ...................... 22

*Agushi v. Duerr,* 196 F.3d 754 (7th Cir. 1999) ............................................................. 5

*Anderson v. Sternes,* 243 F.3d 1049 (7th Cir. 2001) ...................................................... 31

*Bordanaro v. McLeod,* 871 F.2d 1151 (1st Cir.) ............................................................ 19

*Broam v. Bogan,* 320 F.3d 1023 (9th Cir. 2003) ........................................................... 20

*Carter v. Hewitt,* 617 F.2d 961 (3rd Cir. 1980) ...................................................... 10, 31

*Cotter v. McKinney,* 309 F.2d 447 (7th Cir. 1962) ........................................................ 25

*Douglas v. Workman,* 560 F.3d 1156 (10th Cir. 2009) ............................................... 12, 20

*Fineman* v. *Armstrong World Industries, Inc.,* 980 F.2d 171 (3d Cir. 1992) .............................. 22

*Garperini v. Center for Humanities, Inc.,* 518 U.S. 415 (1996) ............................................. 5

*Geitz v. Lindsey,* 893 F.2d 148 (7th Cir. 1990) ........................................................... 31

*Grandstaff v. City of Borger,* 767 F.2d 161 (5th Cir. 1985) ............................................. 19

*Hasham v. California State Bd. of Equalization,* 200 F.3d 1035 (7th Cir. 2000) ...................... 5, 6

*Hillard v. Hargraves,* 197 F.R.D. 358 (N.D. Ill. 2000) ................................................. 5, 26

*In re High Fructose Corn Syrup Antitrust Litigation,*
295 F.3d 651(7th Cir. 2003) ............................................................................. 29

*Juneau Square Corp. v. First Wisc. Nat'l Bank,* 624 F.2d 798 (7th Cir. 1980) ............................ 5

*Kapelanski v. Johnson,* 390 F.3d 525 (7th Cir. 2004) ..................................................... 4

*Leka v. Portuondo,* 257 F.3d 89 (2nd Cir. 2001) ..................................................... 12, 20

*Llaguno v. Mingey,* 763 F.2d 1560 (7th Cir. 1985) ........................................................ 26

*Long v. Cottrell, Inc.,* 265 F.3d 663 (8th Cir.2001) ...................................................... 22

*Martin Trigona v. Gouleta*, 634 F.2d 354 (7th Cir. 1980) ............................................................ 29

*Mayall v. Peabody Coal Co.,* 7F.3d 570 (7th Cir. 1993) ............................................................. 5

*Schick v. Illinois Dept. of Human Services,* 307 F.3d 605 (7th Cir. 2002) ................................... 4, 5

*Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997) ...................................................... 12, 20, 21

*Soltys v. Costello,* 520 F.3d 737 7th Cir. 2008 .............................................................................. 5

*Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007) .......................................................................... 20

*Tennison v. City and County of San Francisco*, 570 F.3d 1078 (9th Cir. 2009) ..................... 12, 20

*United States v. Adames*, 56 F.3d 737 (7th Cir. 1995) .................................................................. 11

*United States v. Apfelbaum,* 445 U.S. 115 (1980) ........................................................................ 31

*United States  v. Finley*, 708 F.Supp. 906 (N.D. Ill. 1989) ..................................................... 30-31

*United States v. Peters*, 791 F.2d 1270 (7th Cir. 1986) ................................................................ 10

*United States v. Thompson*, 359 F.3d 470 (7th Cir. 2004) ........................................................... 10

*United States v. Toma*, 1995 WL 65031 (N.D. Ill. Feb. 13, 1995) ................................................ 30

*United States v. Van Eyl*, 468 F.3d 428 (7th Cir. 2006) ............................................................... 25

*United States v. Williams*, 81 F.3d 1434 (7th Cir. 1996) ......................................................... 5, 26

## Statutes and Other Authority

Fed. R. Civ. Pro. 59 ………………………………………………………………………………….. 1, 4

Fed. R. Evid. 401……………………………………………………………………………………….13, 14

Fed. R. Evid. 403 ………………………………………………………………………………….... 1, 10, 11

Fed. R. Evid. 608(b) …………………………………………………………………………………… 31

Wright & Miller, Federal Practice and Procedure: §2803 (1973 & Supp. 1979) ……………….. 6

## INTRODUCTION

Evidentiary rulings pursuant to F.R.E. 403 made over the course of the trial ultimately excluded all of the substantive evidence against Defendants McDermott and Burzinski and thereby denied Plaintiff a fair trial on his claims against these two defendants. Additionally, during the trial, defense counsel improperly questioned witnesses and made improper arguments that put before the jury improper suggestions about Defendant Suchocki's indictments and the dismissal of the criminal charges against Terrance Thompson. This, in combination with the excluded evidence, left the jury with the mistaken impression that Defendant Suchocki was a lone "bad apple" and that Defendants McDermott and Burzinski were not also responsible for the violation Plaintiff's civil rights. Furthermore, Defendants' counsel's deliberate injection of improper questions and argument so mangled the trial of Plaintiff's malicious prosecution claim that a new trial on this count should be ordered. Finally, evidence of plaintiff's prior use of alias names (which informed the jury of Thompson's lengthy—and inadmissible—arrest history), as well as other evidence was so prejudicial that is should not be allowed in the retrial of this case.

Plaintiff therefore respectfully requests a new trial on the due process and corresponding conspiracy and failure to intervene claims against Defendants McDermott and Bursinski, and malicious prosecution claims against all the Defendants.

## I.     Factual Background

The jury found that Defendant Suchocki alone violated Plaintiff's right to a fair trial by withholding material exculpatory evidence. *See* Docket 372 (jury verdict form). The exculpatory evidence presented to the jury concerned only some of Defendant Suchocki's prior acts of misconduct while he was a member of the Chicago Police Department's Special Operations Section ("SOS"). On the same count for a due process violation, the jury found in favor of

Defendants McDermott and Burzinski. *Id.* Likewise, the jury found in favor of all Defendants on Plaintiff's conspiracy, failure to intervene and malicious prosecution claims. *Id.*

## A. Thompson's Arrest

On September 21, 2002, Plaintiff Terrance Thompson was walking down a Chicago street towards several drug dealers who were standing on a corner. Ex. E (Thompson trial testimony) at 6-7. A Chicago police vehicle approached and the drug dealers fled the area. *Id.* at 7. Officers Suchocki and McDermott jumped out of the vehicle. *Id.* at 8. Officer McDermott grabbed Mr. Thompson and questioned him about where the dealers had gone. *Id.* at 9.

Meanwhile, Officer Suchocki searched the surrounding area and then walked down the gangway. *Id.* at 9-10. When he returned, Officer Suchocki, holding a gun in his hand, stated "look what I got here." *Id.* at 10. Officer McDermott was standing with Thompson, whom he had already searched, when Suchocki returned with the gun. *Id.* at 9-10.The two officers then continued to demand that Mr. Thompson tell them where the drug dealers went and to "give him a house" (meaning a drug house). *Id.* at 10-11. Mr. Thompson did not know where a drug house was located. *Id.* at 11-12. He told the officers that he was there to purchase drugs and did not know where the dealers had run to or where their house was located. *Id.* at 10-12.

The officers arrested Mr. Thompson. *Id.* at 12-13. In their police vehicle and at the station, the Defendants continued to question him about the location of the house and he continued to answer that he did not know of a house. *Id.* at 13. At some point during the arrest, SOS Officers Finnigan and Rice were present; these officers were listed as "victims" on the case report. *See* Pl.'s Trial Ex. 4. The Defendants charged Mr. Thomspon with aggravated unlawful use of a weapon. Ex. E at 15.

**B.      Thompson's Conviction**

In October 2003, Plaintiff was convicted after a jury trial of the charge of aggravated unlawful use of a weapon. *Id.* at 17. The evidence against him at that trial was the testimony of Defendants Suchocki and McDermott. *Id.* at 17; Ex. H (former Assistant Cook County State's Attorney Murray trial testimony) at 26. Mr. Thompson was sentenced to eight years of incarceration. Ex. E at 18.

**C.      Thompson's Conviction Vacated**

Three years later, in the fall of 2006, the Cook County State's Attorney's Office uncovered misconduct within the Special Operations Section. Ex. H at 4, 24; Ex. F (trial testimony of Cook County Assistant State's Attorney Smitko) at 34-36. Around that time, as Mr. Thompson sat in prison, he saw Carl Suchocki on the evening news.  Ex. E at 21-22. Mr. Thompson learned for the first time that Special Operations Sections officers, including officers involved in his very arrest, had been engaged in misconduct.  *Id.* at 17, 22.

Thereafter, Mr. Thompson's criminal defense attorneys filed a petition pursuant to pursuant to Section 5/2-1401 of the Illinois Code of Procedure. Ex. F at 4. The purpose of a Section 5/2/-1401 Petition is to raise facts that were not known to the petitioner or the court at the time of trial that could have caused the court to render a different decision. Docket No. 378 at 3 (stipulated fact). On December 5, 2006, Assistant State's Attorney Kurt Smitko appeared in court to respond to the petition. Ex. F at 4. The State's Attorneys' Office had reviewed the petition. *Id.* at 4-5; *see also* Ex. H at 26. The petition was based on the newly discovered impeachment evidence. Ex. F at 15, 34-36.[1] The State's Attorney's office did not oppose the

---

[1]  The facts set forth in the petition included that: (1) the Chicago Police Department became concerned with the integrity of Officer Suchocki's police work as early as 2002 and started an internal investigation after numerous persons complained about the officer's conduct; (2) that the State's Attorney's Office and prosecutors were concerned that they could not sustain their burden of proof in

petition. Ex. F at 5. The prosecution could not sustain its burden of proof because Carl Suchocki, the main witness against Mr. Thomspon, was not a credible witness. Ex. H at 25-26. The court vacated the conviction and dismissed the charges. Ex. F at 7; *see also* Pl.'s Tr. Ex. 2.

### D. Defendants' Assert The Fifth Amendment

In discovery and at trial, Defendants Suchocki, McDermott and Burzinski invoked their Fifth Amendment right to silence in response to all questions relating to: (1) the arrest and prosecution of Terrance Thompson; (2) the existence of, involvement in, and knowledge of a pattern of misconduct within the Special Operations Sections; and (3) their own involvement in other incidents of false arrests and fabrication of evidence. Ex. D at 3-9, 13-15. It was also stipulated that members of the Special Operations Sections, Officer Rice, Sgt. Eldridge and Lt. Blake, also invoked the Fifth Amendment in response to questions regarding the pattern of misconduct in the Special Operations Sections. Ex. D at 15-19.

## II. THE LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 59(a), a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Those reasons include where a verdict is against the weight of the evidence, the damages are excessive, or for other reasons which made the trial not fair to the moving party. *Kapelanski v. Johnson,* 390 F.3d 525, 530 (7th Cir. 2004).

One such reason is where the evidentiary ruling created unfairness to the moving party. *Schick v. Illinois Dept. of Human Services,* 307 F.3d 605, 611 (7th Cir. 2002). A new trial due to an evidential ruling is appropriate where the admission or exclusion or admission of evidence

---

these cases concerning Suchocki; (3) the State's Attorney's Office adopted a policy of dropping cases in which Suchocki had a significant role and made the arrest; (4) that the newly discovered evidence discredits Officer Suchocki, (5) that there were concerns about Suchocki's police work going back to as early as 2002, and (6) there was no physical evidence connecting Mr. Thompson to crime charged and no evidence corroborating the officers' testimony against Mr. Thompson. Ex. F at 34-36.

had "a substantial influence over the jury" and the result reached was "inconsistent with substantial justice." *Id.* (citing *Agushi v. Duerr,* 196 F.3d 754, 759 (7th Cir. 1999)). This standard is met where there is a "significant" chance" that "evidentiary errors … affected the outcome of the trial." *Schick*, 307 F.3d at 611 (quoting *Hasham v. California State Bd. of Equalization,* 200 F.3d 1035, 1048 (7th Cir. 2000)).

A new trial may also be appropriate where improper statements and argument by counsel caused prejudice to the moving party. *Soltys v. Costello,* 520 F.3d 737, 744 (7th Cir. 2008). *See also Mayall v. Peabody Coal Co.* 7 F.3d 570, 573 (7th Cir. 1993) (improper argument warrants a new trial where they have "influenced the jury in such a way that substantial prejudice resulted to the opposing party") (citations omitted). The court may consider the cumulative impact of improper questioning and argument during the course of the trial to determine whether there was prejudice. *Hillard v. Hargraves*, 197 F.R.D. 358, 361 (N.D. Ill. 2000) (citing *United States v. Williams*, 81 F.3d 1434 (7th Cir. 1996)).

Where the trial result was affected by an improper argument or question, or an evidentiary error, the court should use its authority to protect the right to a jury trial by granting a new trial. "The exercise of a trial court's power to set aside the jury's verdict and grant a new trial is not in derogation of the right of trial by jury but is one of the historic safeguards of that right." *Garperini v. Center for Humanities, Inc.*, 518 U.S. 415, 433 (1996) (internal quotation omitted). *See also Juneau Square Corp. v. First Wisc. Nat'l Bank*, 624 F.2d 798, 806 n.11 (7th Cir. 1980) ("it is the [trial judge's] right, and indeed his duty, to order a new trial if he deems it in the interest of justice to do so") (quoting Wright & Miller, Federal Practice and Procedure: §2803 (1973 & Supp. 1979)).

## IV. ARGUMENT

### A. ALL EVIDENCE RELATING TO THE DUE PROCESS AND CONSPIRACY CLAIMS AGAINST DEFENDANTS McDERMOTT AND BURZINSKI WAS IMPROPERLY EXCLUDED

The trial of plaintiff's due process, conspiracy, and failure to intervene claims against Defendants McDermott and Burzinski was made unfair by: (1) the exclusion of evidence demonstrating the involvement of Defendants McDermott and Burzinski in particular incidents of misconduct, (2) the exclusion of evidence demonstrating the wide scope of the pattern of misconduct within the SOS unit, and (3) defense counsel improperly informing the jury that only Suchocki had been indicted. The exclusion of all substantive evidence of the due process and conspiracy claims against McDermott and Burzinski, substantially adversely affected the outcome of the trial against these Defendants. *See Hasham*, 200 F.3d at 1048 ("evidentiary errors satisfy this standard only if a significant chance exists that they affected the outcome of the trial").

The only substantive evidence regarding other incidents of misconduct presented to the jury (other than the Fifth Amendment assertions) was limited to the incidents involving Defendant Suchocki. It therefore was not surprising that Plaintiff prevailed on his due process claim only against Suchocki. Without substantive evidence regarding (1) the involvement of Burzinski and McDermott in the SOS pattern of misconduct or (2) the widespread nature of the misconduct within the officers' unit, the jury could not have found that the other two Defendants were directly involved in or knew of the ongoing misconduct in Plaintiff's case.

The jurors were instructed that in order to succeed on his due process claim Plaintiff had to establish that a Defendant "deliberately withheld evidence that the officers who testified at Plaintiff's criminal trial engaged in a pattern of misconduct." *See* Docket No. 378 (jury

instructions) at 28. Thus, in order to establish this claim, Plaintiff had to put on evidence that Defendant McDermott (who testified at the criminal trial) had in fact engaged in a pattern of misconduct or knew of the pattern of misconduct by Officer Suchocki. As to Defendant Burzinski, Plaintiff had to establish that he knew that officers Suchocki and McDermott had engaged in a pattern of misconduct. To do this, Plaintiff offered evidence of    (1) other incidents in which the officers were involved in misconduct or witnessed misconduct by the other officers, and (2) the widespread pattern of misconduct in the SOS unit generally. This evidence was necessary to demonstrate Defendants McDermott and Burzinski's knowledge of Suchocki's misconduct in order for plaintiff to prevail on all of his due process claims. *Id.* at 29.

This same evidence was necessary for Plaintiff to prove his conspiracy and failure to intervene claims against all Defendants. To establish his conspiracy claim, Plaintiff had to prove—among other things—that the Defendants formed an agreement to deprive Plaintiff of his right to due process. *Id.* at 30. Thus, the evidence of the officers' direct involvement in the pattern of misconduct and evidence demonstrating that the misconduct was rampant in the unit (therefore known to members of the unit) was necessary to establish the claim.

As this Court explained during the pre-trial conference, there were generally two ways that Plaintiff could establish his constitutional claims. Ex. A at 63. The first was to put on evidence of other incidents of misconduct by these officers through third party witnesses who had been victims of the misconduct. *Id.* The second was to put on testimony of the SOS officers who took part in the pattern of misconduct. *Id.* Both kinds of evidence were offered against Defendants McDermott and Burzinski, and both kinds of evidence were excluded. Without that evidence, it was impossible for Plaintiff to prevail against McDermott and Burzinski.

1. **The Exclusion of All Evidence of Other Incidents of Misconduct By Defendants McDermott and Burzinski Substantially Affected the Outcome of the Claims Against These Officers.**

All evidence of Defendants McDermott and Burzinski's involvement in the pattern of SOS misconduct was excluded. This evidence, set forth in turn below, included (1) the testimony of former-SOS member Villareal who had engaged in such misconduct along with Burzinski, Finnigan and others and (2) third party witnesses who had experienced misconduct at the hands of Burzinski and McDermott. All of this testimony established that Defendants Burzinski and McDermott, as well as Suchoki, were a part of the SOS pattern of misconduct, and therefore was highly probative of the due process, failure to intervene and conspiracy claims.

(a) **The Testimony of Former SOS Officer Villareal Regarding The May 17, 2005 Incident Should Have Been Admitted**

Former SOS member Frank Villareal pleaded guilty to an incident on May 17, 2005 that involved officers Finnigan, Herrera, and Defendant Burzinski. *See* Docket No. 354, Plaintiff's Memorandum and Proffer, Exhibit C (Villareal transcript) at 19 (identifying Finnigan, Herrera and another SOS officer); Pl's Trial Exhibits 165-166 (identifying Burzinski). The officers had taken two men into custody and then illegally entered and searched the residence of one of the men without legal justification. *See* Docket No. 354, Exhibit C at 19-21. The officers recovered drugs and $30,000 in cash from inside the home. *Id.* at 21. Only $463 of the currency was inventoried, the remainder was split between the officers. *Id.* at 21-22. The two men were arrested and charged with possession of narcotics. *Id.* at 21.

The SOS officers intentionally wrote false reports. *Id.* at 23. The reports falsely stated the reasons for the stop, including giving a false basis for the traffic stop and falsely reporting that it related to a burglary investigation. *Id.* at 23. The reports further falsely stated that one of the men dropped a bag containing the drugs in the yard (when in fact the bag was not dropped by one of

the men in the yard but was recovered in the residence). *Id.* Villareal agreed to give false testimony during the criminal proceedings in order to conceal the unlawful stop, searches and searches. *Id.* at 24. The criminal charges on that case were eventually dismissed by nolle prosequi. *See* Pl.'s Trial Ex. No. 166 at G05603.

Plaintiff's trial exhibits 165 and 166 demonstrated that Defendant Burzinski was involved in the search and arrests. Plaintiff's Trial Exhibit 165 are the police reports listing Burzinski as both a "reporting officer" and an "arresting officer" along with Officer Finnigan. Furthermore, when asked at his deposition whether he participated in the May 17, 2005 search and seizure, and whether he took cash, Defendant Burzinski answered by asserting his Fifth Amendment right to silence. Exhibit J, dep. at 113-117; *see also* Exhibit K, proposed stipulation.

Villareal's testimony regarding this incident was excluded by the Court pursuant Federal Rule of Evidence 403 for fear of undue prejudice to the Defendants.[2] Plaintiff recognizes that this Court carefully weighed the probative value of all of the evidence against the risk of prejudice. Respectfully, however, this ruling went too far in the direction of protecting the officers from any risk of prejudice at the expense of probative evidence. This evidence was highly probative of Officer Burzinski's involvement the SOS pattern of misconduct. In addition to conducting an illegal stop, search and stealing money, Villareal admits that the officers falsified police reports and came to an agreement that he would give false testimony at criminal court proceedings. Docket No. 354, Exhibit C at 19-24. That agreement to give false testimony is especially relevant here to the conspiracy claim in which Plaintiff had to prove that Burzinski

---

[2] At the time of this filing, Plaintiff has not yet received the portion of the trial transcript in which the Court first ruled on this motion. Plaintiff will supplement this filing with the relevant transcript upon receipt. Plaintiff also moved for reconsideration of the ruling mid-trial after several of the other incident witnesses had been excluded, that motion was also denied. *See* Ex. G at 13-15.

agreed with the others to withhold impeachment evidence regarding the officers who testified against him during the criminal trial.

For evidence to be excluded under Rule 403, its probative value must be "substantially outweighed" by the risk of unfair prejudice. Here, this evidence was highly probative direct evidence of Defendant Burzinksi's involvement in, and therefore knowledge of, the SOS pattern of misconduct. The risk of some prejudice to Defendants could not outweigh the crucial probative value of the evidence. *See United States v. Thompson*, 359 F.3d 470, 479 (7th Cir. 2004) (in upholding the admission of highly probative and prejudicial evidence: "all probative evidence is prejudicial to the party against whom it is offered. Rather, the relevant inquiry is whether there was *unfair* prejudice.").

"Evidence is 'unfairly prejudicial if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case.'" *United States v. Peters*, 791 F.2d 1270, 1294 (7th Cir. 1986) (quoting *Carter v. Hewitt*, 617 F.2d 961, 972 (3rd Cir. 1980) (internal citations omitted)). The potential for prejudicial impact must be assessed in light of the other evidence that was presented to the jury. In this case, the jury heard evidence that these officers, as well as their supervisors, invoked their Fifth Amendment rights in response to questioning regarding other incidents of misconduct and widespread misconduct within the SOS unit. The jury also heard testimony from Assistant State's Attorneys regarding an investigation into criminal conduct within the SOS unit[3] and accounts of two other incidents of misconduct by SOS officers from witnesses Kenya Richmond and Anthony Castro. In the context of this evidence regarding of criminal misconduct by other members of SOS, the excluded evidence of Defendant

---

[3] In addition to Bernard Murray's testimony regarding the criminal investigation (Ex. H at 4), defense counsel also informed the jury the of the criminal indictments (discussed further below).

Burzinski's involvement in this incident cannot be characterized as "shocking or repulsive, such as to elicit an emotional response from the jury." *United States v. Adames*, 56 F.3d 737, 742 (7th Cir. 1995) (upholding the trial court's admission of evidence because the evidence was not "shocking or repulsive, such as to elicit an emotional response from the jury").

### (b)    The Testimony of Michael Temple That Defendant Burzinski Planted A Gun On Him Should Have Been Admitted

Michael Temple would have testified that on June 12, 2005 he was falsely arrested by SOS officers including two of those involved in Plaintiff's arrest, Defendant Burzinski and witness Jerome Finnigan.[4] Ex. B at 127 (proffer of evidence). Mr. Temple would have testified that Defendant Burzinski planted a gun on him and charged him with a gun crime that he did not commit. *Id.*

Defendant Burzinski was asked questions about the arrest of Michael Temple at his deposition and to each of those questions Burzinski asserted his Fifth Amendment right to silence. Exhibit J, dep. at 139-148. Plaintiff sought to read his assertion of the Fifth Amendment regarding Temple's arrest at trial, but that testimony was also excluded. The testimony was that Burzinski had asserted the Fifth regarding (1) "whether he planted a gun that was received from Special Operations Section Margaret Hopkins on arrestee Ike Hardy [the co-defendant/arrestee of Michael Temple] during his June 13, 2005 arrest," and (2) "Whether he made false statements to the Cook County State's Attorney's Office regarding the evidence against arrestees Michael Temple and Ike Hardy." *See* Exhibit K, proposed stipulation.

In granting the Defendants' motion to bar Mr. Temple from testifying, the Court noted that "[i]t was a close call because the allegation involved is precisely the same type of conduct

---

[4] The other officers involved in Temple's arrest were Hopkins and Villareal, two of the officers who have pleaded guilty to their crimes as SOS officers. Plaintiff also sought to admit their testimony at trial (discussed below).

that's alleged by the plaintiff in this case." Ex. C at 231. The Court, however, found that because Mr. Temple's arrest was two years after Mr. Thompson's conviction, it was "too far removed" from the relevant time frame. *Id.*[5]

Mr. Temple's arrest, however, was not outside of the relevant timeframe. By June 2005, Mr. Thompson's conviction had been reversed; however, Thompson he remained incarcerated and continued to face the criminal prosecution on the UUW charge. Throughout the judicial proceedings, which continued until December 2006, the officers were required to disclose any exculpatory and/or impeachment evidence that could have been utilized by Plaintiff to fight the UUW charge. *Douglas v. Workman*, 560 F.3d 1156, 1173 (10th Cir. 2009) ("We emphasize that the duty to disclose such information continues throughout the judicial process."). *See also Tennison v. City and County of San Francisco*, 570 F.3d 1078 (9th Cir. 2009) (holding that Brady requires disclosure of exculpatory evidence discovered during post-conviction proceedings); *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) (holding that "*Brady* requires disclosure of information that the prosecution acquires during the trial itself, or even afterward"); *Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997) (finding that Brady required the disclosure of impeachment evidence while case was on appeal").

That his arresting officers continued to engage in the pattern of misconduct was highly important impeachment evidence that Mr. Thompson could have used obtain the dismissal of the

---

[5] The Court's pre-trial ruling also took into consideration that the Court anticipated a much longer trial with more evidence of other incidents than what was ultimately available. *See* Ex. C at 231-32. As the trial unfolded, the evidence became more and more limited (with the resulting trial taking less than one week). Of the eleven witnesses to other incidents listed by Plaintiff in the pre-trial order, two were called to testify (Castro and Richmond). Of the remaining nine proposed witnesses, Plaintiff was unable to serve subpoenas upon two (Fields and Davis) and served but then was unable to locate or secure the appearance of another (Glover). Four were barred (Vergil, Wisneiewski, Conrad, Temple) and one was not called by Plaintiff due to questions of credibility. The final witness, Jose Reyes, was flying in to testify on the Friday of the trial. His testimony related only to Suchocki and not the other two Defendants. Thus, when the rest of Plaintiff's evidence was completed on Wednesday, Plaintiff determined it was not worth it to prolong the trial just to have another Suchocki incident presented.

UUW charge before December 2006. Further, Burzinksi's ongoing involvement in the pattern of misconduct was evidence relevant to demonstrating his previously knowledge of and agreement in the pattern at the time Mr. Thompson's arrest. *See* Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

**(c)** **Testimony from Rafael Vergil About Burzinksi's and McDermott's Involvement in Misconduct with Officer Finnigan Should Have Been Admitted**

Rafael Vergil would have testified that on December 8, 2002, Defendants Burzinski and McDermott, along with three other SOS officers including Finnigan, illegally entered his home. Ex. B at 111 (proffer). The officers searched the home without consent or legal justification. *Id.* The officers subsequently made false statements to the Department's Office of Professional Standard to cover their own and each other's misconduct. *Id.; see also* Pl.'s Trial Ex. 44 (CR file containing officers' statements).

The Court held that the evidence was not relevant because the conspiracy claimed by Plaintiff was a conspiracy to violate his due process rights and there was no due process violation in the Vergil incident. Ex. B at 112. While true that Plaintiff's constitutional claim at issue is a due process claim, that should not end the inquiry. The widespread misconduct by the SOS officers is relevant to both the due process and the conspiracy claim, even where the fact patterns are not identical. The relevant point is that these officers knew of, and were involved in, the widespread misconduct within the unit. The fact that the misconduct varied in methodology from day to day should not make its presence any less salient. If Officers Burzinski and McDermott knew about SOS misconduct in the form of conducting illegal searches by their teammates and

allowed it to continue, it is likely that they also concurred in other the forms of misconduct that were occurring during the same period of time by the same group of officers. *See* Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

        **(d)     Testimony from Donald Wisneiewski About Burzinksi's and McDermott's Involvement in Misconduct with SOS Officers Suchocki, Finnigan, Rice and McGovern Should Have Been Admitted**

Mr. Wisneiewski would have testified that on February 15, 2003 Defendants McDermott, Burzinski, and Suchocki, along with Finnigan and Rice (both of whom were present for Plaintiff's arrest) and former-Officer McGovern[6] entered his family's home without consent or legal justification. Ex. B at 112 (proffer of testimony). The officers illegally searched the home for guns. *Id.* at 113. The officers made an arrest, for which they falsified the reports regarding the manner in which the guns were located. *Id.*

Mr. Wisneiewski's testimony would have been evidence of the SOS illegal conduct in their quest to procure as many guns as possible by any means necessary. This testimony should have been allowed to demonstrate that McDermott and Burzinski knew of and were involved in the SOS misconduct along with Suchocki and Finnigan. The Court, however, ultimately excluded the evidence, because it did not involve the fabrication of evidence or a false arrest.

---

[6] Former-Officer McGovern has since pleaded guilty to criminal conduct as an SOS officer.  His testimony in his guilty plea was also excluded from evidence, as discussed below.

## 2. The Exclusion of the Evidence That Would Have Established the Widespread Practices of the SOS Unit Generally

The testimony of five of the Defendants' teammates from the Special Operations Section regarding the widespread misconduct should not have been excluded. This evidence was highly probative to both the due process and the conspiracy claims. Further, testimony regarding acts of misconduct by the officers who engaged misconduct along with the Defendants is not unfairly prejudicial to the Defendants. This evidence is central to the core issues in this case. Any concern that the jury might blame the Defendants for the misconduct of others is properly resolved by instructions on the requirement of personal involvement.

### (a) The Excluded Evidence of the Testimony of SOS Officers Who Participated in the Pattern of Misconduct

Plaintiff sought to introduce the testimony from five of the Defendants' former colleagues from the Special Operations Section (officers Hopkins, Maka, Markiewicz, Villareal, and McGovern) about the pattern of misconduct within the unit. *See* Docket No. 354, Mem. and Proffer In Support of Admission Into Evidence The SOS Officers' Guilty Pleas (henceforth "Proffer"). The testimony of these officers described nine incidents from 2003 through 2005. These incidents involved, among other things:

(1) The SOS officers stopped citizens without any lawful basis *See* Proffer Ex. B, Maka plea at 23, 29 and 35 (describing incidents on 12/3/03, 9/18/04, 11/11/04); Proffer Ex. C, Villareal plea at 9-10, 13, 19-20 (describing incidents on 3/28/04, 6/30/04, 5/17/05); Ex. D, McGovern plea at 8-9 (describing 12/3/03 incident).[7]

(2) The SOS officers created false police reports regarding the circumstances of the arrest, the evidence recovered, and/or the basis for the criminal charges. *See* Proffer Ex. A (Hopkins) at 14-16, 20 (describing incidents on 8/12/05 and 11/1/05); Proffer Ex. B, Maka plea at 24, 28, 52-54 (describing incidents on 12/3/03, 2/14/04, 8/12/05); Proffer Ex. C,

---

[7] For the sake of efficiency, Plaintiff refers to the transcripts previously provided to the Court with Plaintiff's Memorandum and Proffer on this issue, Docket No. 354.

Villareal plea at 11-12, 18, 23 (describing incidents on 3/28/04, 6/30/04, 5/17/05).

(3) The SOS officers gave false testimony at criminal proceedings. Proffer Ex. B, Maka plea at 24 (12/3/04 incident); Proffer Ex. B, Markiewicz plea at 55-56 (8/12/05 incident); Proffer Ex. C (Villareal) at 23-24 (5/17/05 incident).

(4) The SOS officers took money recovered for themselves instead of inventorying it. *See* Proffer Ex. A, Hopkins plea at 16 (8/12/05 incident); Proffer Ex. B, Maka plea at 27, 31-32, 35, 37 (incidents on 2/14/04, 9/18/04, 11/11/04); Proffer Ex. C, Villareal plea at 11, 21-22 (incidents on 3/28/04 and 5/17/05); Proffer Ex. D, McGovern plea at 9-10 (12/3/03 incident).

The relevance of this testimony is not limited to demonstrating individual instances of the pattern of misconduct (a significant purpose in itself). It is also powerful evidence of the general knowledge within the unit of the ongoing misconduct. Indeed, the testimony contains striking accounts of supervisors receiving portions of the stolen money and assisting the officers in coordinating their stories to cover-up their misconduct. *See* Proffer Ex. B, Maka plea at 27-28 (describing 2/14/04 incident, after which sergeant assisted in laundering stolen cash) and 33-35 (describing sharing stolen proceeds with sergeant and sergeant's role in mediating a dispute between officers regarding stolen cash); Proffer Ex. A, Hopkins plea at 12-13 (describing meeting with lieutenant and supervising sergeant in which false statements were planned).

Furthermore, every one of the nine incidents described in the former officers' plea testimony involved SOS officer Jerome Finnigan. It is undisputed that he was also on the scene of Plaintiff's arrest. *See* Pl.'s Trial Ex. 4. Finnigan's presence is significant because he was the leader of the SOS pattern of misconduct. *See, e.g.,* Proffer Ex. A, Hopkins plea at 14-16 and Ex. B, Markiewicz plea at 52-54 ("The officers had a conversation, led by Finnigan, in which they agreed …"). Finnigan led the officers not just in the course of conduct but in determining how the reports and evidence would be falsified, including the false testimony given in criminal court

16

proceedings by other officers. *Id.; see also* Proffer Ex. B (Maka) at 24 (describing falsification of the 12/3/03 police reports at the direction of Officer Finnigan).

Defendants in this case were involved in two of the described incidents. Officer Suchocki was one of the five SOS officers involved in the December 3, 2003 incident to which Officer Maka pleaded guilty. *See* Plaintiff's Trial Exhibits. 163 and 164. Officer Burzinski was involved in the May 17, 2005 incident (along with officers Finnigan, Villareal and Herrera) to which Officer Villareal pleaded guilty. *See* Plaintiff's Trial Exhibits. 165-166.

**(b)      The Relevance of This Highly Probative Evidence Was Not Outweighed By Its Probative Value**

The testimony of these former-SOS members was highly probative. This is sworn testimony of the same people with whom the Defendants engaged in the pattern of misconduct admitting to acts of misconduct as SOS officers. Each of the nine incidents demonstrates the same pattern of misconduct by SOS officers that was at issue in this case.

The events described in the officers' plea testimony and the testimony of Terrance Thompson demonstrate varying degrees the same pattern. The first step in the SOS pattern was that the officers would stop citizens without probable cause who they believed may be aware of drug activity. The second step was that they would use the stop, and the threat of arrest and criminal charges, to demand information regarding the location of guns or drugs. The third step would depend on whether or not the person cooperated with the officers' demands. If that person was able to provide the information, they would offer leniency. If that person failed to cooperate (*i.e.,* would/could not give the officers what they wanted) the officers would punish them with

false arrests and fabricated charges. In this process, the SOS officers often conducted illegal searches and would steal property (if available).[8]

While different incidents vary in methodology and scope depending on the circumstances, all of these individual incidents are evidence of the widespread pattern of misconduct in the SOS unit. They are probative of the existence of the "impeachment evidence" relevant to the due process claim, the officers' awareness of ongoing misconduct relevant to all of the claims, and the agreement between the officers relevant to the conspiracy claim.

### (c) The Guilty Plea Testimony Regarding Stops of Citizens Without Probable Cause Are Relevant to Establishing the SOS Pattern of Misconduct

In ruling on the admissibility of the testimony, the Court found that the incidents involving stops without legal justification were not relevant. In doing so, the Court narrowed the pattern of misconduct evidence too far. Stopping random citizens on the street without proper legal justification in order to gain knowledge about where guns, drugs and money could be located was the first step in the SOS pattern. This first step is consistent with how Mr. Thompson's encounter with the SOS officers began. Although Mr. Thompson subsequently admitted that he was in the area to purchase drugs, at the time of the stop all that the officers knew was that he was walking down a street on which drug dealers were located (and had fled at their approach).

What Plaintiff had to demonstrate in this case was not that the SOS officers engaged in acts of misconduct identical to what Plaintiff experienced, but that the officers engaged in pattern of misconduct. The initial stops without probable cause were the first step in that pattern. Thus,

---

[8] Consistent with the SOS pattern, Mr. Thompson was stopped without justification (step 1) and the officers used their ability to arrest and criminally charge him in an effort to force him to provide them with the information regarding the drug house (step 2). When Mr. Thompson failed to cooperate, refusing their repeated demands for information, he was charged with a crime that he did not commit (step 3).

while the stop itself like the arrest itself was not the basis for Plaintiff's legal claims, these other incidents, which the SOS officers have admitted under oath, were nonetheless very much relevant to the pattern of misconduct at issue.

        **(d)**        **The Guilty Plea Testimony Regarding Incidents of Stealing Are Relevant to Establishing the SOS Pattern of Misconduct**

Like the illegal seizures, the Court also found that the incidents of stealing were not relevant. While the illegal seizure was often the first step in the SOS pattern, stealing money was typically the last. Because Mr. Thompson did not have more than a few dollars on his person, this step was not a part of his encounter with the SOS. It was nonetheless one part of the same SOS pattern very much at issue in this case. Furthermore, it is the taking of money which demonstrates the officers' motivation in the pattern of misconduct.

        **(e)**        **The Post-2003 Incidents Are Relevant to Plaintiff's Due Process and Conspiracy Claims**

In part, the Court found the incidents described by the SOS officers in their guilty pleas to be less relevant because they occurred after Plaintiff's criminal trial. All the events described, however, occurred while the criminal proceedings were ongoing in both the appellate and post-conviction proceedings. Plaintiff's criminal conviction was reversed on March 31, 2005 and for the following year and a half, until December 2006, continued in appellate and post-conviction proceedings.

The evidence demonstrating the continuing pattern of misconduct through 2004 and 2005 is relevant for two purposes. First, the subsequent events are relevant to demonstrate the earlier existence of pattern. *Bordanaro v. McLeod*, 871 F.2d 1151, 1166-67 (1st Cir.), *cert. denied*, 493 U.S. 820, 110 S.Ct. 75 (1989) (post-incident conduct may be relevant to establishing a "preexisting disposition"); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985), *cert.*

*denied*, 480 U.S. 916, 107 S.Ct. 1369 (1987) (subsequent action relevant to demonstrate that "the way things were done and have been done in the City.").

Second, the ongoing pattern of misconduct was additional impeachment evidence that the officers were required to disclose. Consistent with *Brady,* the Seventh Circuit has held that the duty to disclose exculpatory evidence which is known at the time of the trial continues throughout any appeal and post-conviction proceedings. *Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007). Likewise, the *Brady* duty extends to exculpatory evidence that is discovered post-trial, but while the criminal proceedings are ongoing. *See Tennison v. City and County of San Francisco*, 570 F.3d 1078 (9th Cir. 2009); *Leka v. Portuondo*, 257 F.3d 89, 100 (2nd Cir. 2001); *Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997). *See also Douglas v. Workman*, 560 F.3d 1156, 1173 (10th Cir. 2009) ("We emphasize that the duty to disclose such information continues throughout the judicial process.").

In *Tennison*, the defendants received a taped confession by another man confessing to the crime of which Mr. Tennison had been convicted. *Tennison*, 570 F.3d at 1093. The defendants in that case argued that the evidence was immaterial because it came post-conviction. The Ninth Circuit, however, rejected that argument. *Id.* "The fact that the Inspectors received the tape of the confession after the guilty verdict was rendered is immaterial because the record discloses that they received the tape while they were still involved in the new trial and post-conviction proceedings." *Id. citing Broam v. Bogan*, 320 F.3d 1023, 1030 (9th Cir. 2003) ("A prosecutor's decision not to preserve or turn over exculpatory material before trial, during trial, or after conviction is a violation of due process under [ *Brady* ]."); *Leka*, 257 F.3d at 100 (stating that "*Brady* requires disclosure of information that the prosecution acquires during the trial itself, or

even afterward"); *Smith*, 115 F.3d at 820 (finding that Brady required the disclosure of impeachment evidence while case was on appeal").

In this case, from the time of Plaintiff's arrest in September 2002 through the appeal and post-conviction proceedings, the SOS pattern of misconduct and corruption continued and the Defendants learned of more and more impeachment evidence, including Burzinski and Finnigan's May 17, 2005 incident and Suchocki and Finnigan's December 3, 2003 incident. Throughout the appeal and post-conviction proceedings, the Defendants were bound by *Brady* to disclose both the impeachment evidence that they knew at the time of the conviction and the closely related "new" evidence that increased everyday as their pattern of misconduct and corruption continued. All of this evidence could be used by Plaintiff at any time prior to December 5, 2006 to fight the ongoing criminal case and secure an earlier release.

### C. DEFENSE COUNSEL'S IMPROPER QUESTIONING AND ARGUMENT SUBSTANTIALLY AND DETRIMENTALLY AFFECTED THE OUTCOME OF PLAINTIFF'S MALICIOUS PROSECUTION CLAIM

The Defendants ignored this Court's rulings *in limine* and on trial objections in order to use improper questioning and arguments to suggest to the jury that Defendants' assertions of the Fifth Amendment were meaningless and completely unconnected to Mr. Thompson's case. That argument was incorrect and improper, it was further prejudicial because at that stage Plaintiff had no means to rebut it as the underlying evidence had been excluded – on the grounds that neither it nor the argument ultimately made by the Defendants was proper.

Although this Court had barred any reference to the indictments of the SOS officers, including Suchocki, Defendants themselves elicited testimony regarding the indictments. Once reference was made to the indictments, it had been heard by the jury and could not be taken back. Defense counsel then used the unexplained indictments, along with improper argument, to

mislead the jury to believe that the Defendants' assertions of the Fifth Amendment and the State's Attorney's dismissal of the criminal charges against Terrance Thompson had nothing to do with Mr. Thompson's case. Taken together, Defendants' (1) improper questioning regarding the indictments, (2) improper questioning of former ASA Chief of Felony Prosecutions Murray regarding indicative of innocence, and (3) improper argument at closing, resulted in an outcome that was inconsistent with substantial justice. *See Adams Lab., Inc. v. Jacobs Engineering Co., Inc.,* 761 F.2d 1218, 1227 (7th Cir. 1985) (granting new trial where "cumulative effect" of improper occurrences "viewed in the context of the entire trial unduly prejudiced" party); *Long v. Cottrell, Inc.*, 265 F.3d 663, 667 (8th Cir. 2001) ("Improper questions that place prejudicial information before the jury may entitle the aggrieved party to a new trial."); *Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171, 210 (3d Cir. 1992) ("argument injecting prejudicial extraneous evidence constitutes reversible error").

## 1.     THE REFERENCE TO THE UNEXPLAINED INDICTMENTS

### (a)     The Court's Rulings on the Indictments

The Court first addressed the admissibility of the indictments on Defendants' motion *in limine,* which argued that the indictments were unfairly prejudicial. *See* Docket No. 263.[9] The Court held that the Suchocki's indictment could come in but only as "needed to explain why and how the case against [Thompson] was dismissed." Ex. A, 10/28/09 at 57-58. The motion to bar was granted to as to the other indictments. *Id.* at 58.

On October 29, 2009, during the pre-trial conference, the issue of Suchocki's indictments came up again. The Court made clear that the issue of indictments needed to be fully addressed so that nothing would improperly come up with the jury. *See* Ex. B at 222. The Court again

---

[9] In argument on that motion, Defendants changed their position and argued that Suchocki's indictment should come in on the malicious prosecution claim to explain why the criminal charges against Mr. Thompson was dismissed.

explained that the indictments were not relevant for any purpose except potentially as necessary to explain the dismissal of the criminal charges against Thompson. *Id.* at 222-223. The Court also noted that even that limited purpose may not be necessary. *Id.* at 223. Defendants, however, argued that Suchocki's indictment was relevant and that they also should be allowed to be present evidence that the indictment was dismissed. *Id.* at 222-23. Defendants argued that the indictments were highly prejudicial, and yet it was Defendants who wanted to introduce the indictments. *See, e.g., id.* at 225-226.

The Court ruled that if the State's Attorneys could adequately testify about the reasons why the case against Thompson was dismissed without mentioning the indictments (by, for example, explaining it in terms of the lack of credibility of the officers), then there should be no mention of any of the indictments. *Id.* at 226-227. Thus, the multiple evidentiary disputes that came hand in hand with the indictments (including the admissibility of the charges contained in the indictments and the dismissal of the indictments) would be thereby be resolved without any risk of prejudice to either party. *Id.* The Court then instructed the parties that if that could not happen – if the State's Attorneys could not adequately discuss the dismissal of the Thompson criminal charges without mentioning the indictments – then the Court and the parties would have to address the other evidentiary questions. *Id.* at 227. The Court's ruling on the indictment was explained again the following day, on October 30, 2009. *See* Ex. C at 303-305.

The admissibility of the indictments arose at trial for the first time during the testimony of Assistant State's Attorney Kurt Smitko. Mr. Smitko testified that about the newly discovery impeachment evidence. Ex. F at 15. Defense counsel argued that this reference opened the door to the fact that the indictment against Suchocki had been dismissed. *Id.* The Court rejected that argument. *Id.* at 15, 29-33. During this hearing, the defense counsel admitted that they wanted

the indictments to come in, although they also argued that evidence relating to the indictments was highly prejudicial. *Id.* at 33.

### (b) Defendants' Violation of the Court's Ruling

The Court had explained the ruling on the indictments – a ruling that resolved multiple other complicated evidentiary disputes – at length on October 29th, October 30th and November 3rd. Despite those careful rulings, in questioning former chief of the criminal prosecutions bureau of the Cook County State's Attorney's Office, defense counsel asked, "Was Timothy McDermott one of the indicted officers?" Ex. H, 11/5/09 transcript at 4. Plaintiff's objection was sustained and the jury was instructed to disregard both the question and the answer. Defense counsel, however, then followed up by asking yet another improper question, "Was Carl Suchocki one of the indicted officers?" *Id.* Plaintiff again objected and a lengthy side bar argument was followed.[10] *Id.* 4-21. The objection was sustained during the sidebar, outside of the jury's presence. *Id.* at 22-23.

### 2. DEFENDANTS' IMPROPER QUESTIONING AND ARGUMENT REGARDING "INDICATIVE OF INNOCENCE"

As with the questioning about the indictments, defense counsel asked multiple improper questions. These questions, in combination with counsel's argument strongly suggested that the State's Attorney's decision had nothing to do with the merits of the case against Mr. Thomspon. Ex. H at 23.

> Q.   When Mr. Thompson's criminal case was vacated and dismissed on December 6th -- 5th, 2006, pursuant to a 2-1401 motion, was that indicative of Mr. Thompson's innocence –

---

[10] At sidebar, defense counsel claimed to have understood the Court's ruling barring reference to the indictment to be based upon a lack of foundation. *See* Ex. H at 4-5, 8-9. Nowhere in the pages and pages of discussion and argument regarding the indictment is the question of foundation even raised. *See* Ex. A at 54-58, Ex. B at 222-227, and Ex. C at 303-305.

MR. CERDA:  Objection.

BY MS. YANOW:
Q.      -- that 2-1401 petition?

THE COURT:  Sustained.

BY MS. YANOW:
Q.      If Mr. Kurt Smitko did not oppose the 2-1401 petition on
your direction, was that because the state's attorney's office
believed that Mr. Thompson was innocent of the charges against him?

MR. CERDA:  Objection, your Honor, foundation.

THE COURT:  Sustained.

Ex. H at 23-24.

In closing arguments, defense counsel told the jury to disregard the Court's ruling on the objection. Counsel stated, "You heard Mr. Murray testify that that dismissal was not indicative of innocence." Ex. I 11/5/09 Closing at 19.[11] This argument was highly improper. Mr. Murray did not give any such testimony. Counsel's arguments contradicting both the evidence in the case and the Court's ruling, thus urging the jury to do the same, were improper and require a new trial on the malicious prosecution claim. *United States v. Van Eyl*, 468 F.3d 428, 436-38 (7th Cir. 2006) (upholding granting of new trial where prosecutor made an improper, and persuasive, argument which could have affected the verdict); *Cotter v. McKinney,* 309 F.2d 447, 552 (7th Cir. 1962) (upholding granting of new trial where attorney improperly argued inadmissible evidence—suggesting insurance coverage—at closing).

---

[11] The Court overruled Plaintiff's objection. *Id.*

3. **Defendants' Improper Questioning Allowed Them To Make The Misleading Argument Suggesting That The Officers' Assertions of The 5th Amendment and The Dismissal of the Criminal Charges Against Plaintiff Had Nothing To Do With Mr. Thompson**

The significance of the Defendants' improper questioning and argument regarding indicative of innocence must be viewed in conjunction with the improper introduction of the unexplained indictments and Defendants' closing argument. The court should consider the cumulative impact of these trial errors and misstatements to determine that they were in fact prejudicial. *Hillard v. Hargraves*, 197 F.R.D. 358, 361 (N.D. Ill. 2000) (citing *Llaguno v. Mingey*, 763 F.2d 1560 (7th Cir. 1985) (plaintiffs in civil rights case entitled to new trial because of cumulatively serious trial errors); *United States v. Williams*, 81 F.3d 1434, 1443-44 (7th Cir. 1996) (total impact of all irregularities at trial, not each one examined in isolation, determines whether a defendant is entitled to a new trial). Defendants injected error into the trial by introducing evidence of the unexplained indictment against Suchocki and incorrectly inferring the indictment had no bearing on the dismissal of Terrance Thompson's criminal case.

As this Court recognized throughout the proceedings, any reference to the indictments brought on a host of complicated evidentiary disputes. The indictments themselves had no probative value to the issues in this case unless they were necessary to explain the reasons for the December 5, 2006 dismissal of the criminal charges against Mr. Thompson.[12] If that occurred (if the State's Attorneys testified that the case was dismissed because Suchocki was under indictment) then the jury would have needed to know what the indictments were about in order to assess whether or not the criminal charges were dismissed in a manner that was indicative of Plaintiff's innocence. *See* Ex. H at 12-16.

---

[12] Ultimately, reference to the indictments was not necessary for that purpose. The dismissal was easily explained in terms of the investigation into complaints of misconduct by the SOS officers and that Mr. Suchocki was no longer a credible witness due to the allegations under investigation.

Defendants essentially circumvented the evidentiary issue to make full use of the indictments in a manner that was favorable to them without bringing in the evidence that would have rebutted their argument. Thus, Defendants were able to achieve their original goal, to use the unexplained indictments in order to argue that Mr. Thompson case was only dismissed because Suchocki happened to be indicted at the time for reasons completely unrelated to Mr. Thompson's criminal case (and, of course, was no longer under indictment). *See, e.g.,* Ex. H at 17-18. Had Defendants done this properly by admitting evidence (instead of making suggestive arguments based upon improper questioning) then the full story of the indictments (the nature of the indictments and the reasons why the Defendants continue to assert the Fifth Amendment) would have become admissible. Plaintiff would have sought to use this evidence to rebut Defendants' argument by establishing that the indictments discredited Suchocki's testimony in the Thompson case in particular (and not because there just happened to be some unrelated indictment). The crimes charged were the same as the pattern of misconduct to which Mr. Thompson – like Mr. Castro and Mr. Richmond and countless others – were subjected. In other words, although Suchocki was not indicted for his actions towards Mr. Thompson, the indictments were very much related to the pattern of SOS misconduct to which Mr. Thompson was subjected. Thus, the dismissal of the criminal charges because Officer Suchocki had been indicted was indicative of Mr. Thompson's innocence.

That would have prolonged the case significantly and brought in all kinds of additional evidentiary disputes regarding the prejudicial nature of the evidence and the competence of certain testimony from the State's Attorneys involved in the cases. The substance of the indictments was prejudicial to Defendants due to the nature and seriousness of the allegations. The indictments included dozens of allegations including kidnapping, burglary, robbery,

unlawful restraint, obstruction of justice, official misconduct and possession and manufacturing/delivery of a controlled substance. *See* Defs.' Trial Exhibits. 105-107.

The Court's careful ruling resolved all of these issues. Defendants were not allowed to suggest that the dismissal of Suchocki's indictment cleared his name of all wrongdoing, as Plaintiff had feared. Plaintiff, on the other hand, was not allowed to bring in the numerous criminal charges against Suchocki, as Defendants had feared.

Defendants, however, effectively sidestepped the Court's ruling. Defendants introduced an unexplained indictment, which allowed them to make the powerful argument in closing that some SOS officers got in trouble, but that it had nothing to do with Mr. Thompson, who lucked into being able to take advantage of the situation. *See, e.g.* Ex. I (transcript of Defs' closing) at 23 ("Circumstances allowed him to have his conviction dismissed after he spent three years in jail on an eight-year sentence. That should be reward enough."); 6, 8, 9, and 11 (all stating "this is not guilt by association"). They then reinforced this argument by citing to non-existent evidence (that Bernard Murry said that the dismissal was not indicative of innocence). *Id.* at 19. Of course, at that point because Plaintiff was not allowed to introduce the indictments into evidence, plaintiff was not able to argue in rebuttal that although Suchocki was not indicted for his actions towards Mr. Thompson, the indictments were very much related to the pattern of SOS misconduct to which Mr. Thompson was subjected

Without again having to mention of the word "indictment," the theme of the entire closing argument was that for reasons completely unrelated to this case, some SOS officers (including Suchocki, but not McDermott or Burzinski) had been in trouble and now these officers have to assert the Fifth, but the jury should not take that mean anything. *See, e.g.* Ex. I at 3-4 (because they acted "on the advice of counsel to not testify to the specific facts in this case;

and, unfortunately, we are unable to hear their testimony concerning Mr. Thompson's arrest…");
4 ("The Fifth Amendment is asserting a privilege…It isn't an admission …it's not evidence"), 18
(same).[13] Defense counsel argued to the jury that the assertion of the Fifth Amendment was
meaningless. *Id.*

The argument was contrary to the law, unfair and improper. The jury was never given the
evidence necessary to assess this suggestion criminal charges against Suchocki did not discredit
his testimony against Mr. Thompson. Furthermore, it also gave the very improper and misleading
suggestion that the Defendants' assertion of the Fifth Amendment regarding the Thompson case
and their involvement in the SOS pattern of misconduct (*see* Ex. D) were meaningless. The Fifth
Amendment, however, may not be raised unless there is a good faith basis for doing so. An
attorney's argument otherwise is extremely improper. *United States v. Apfelbaum*, 445 U.S. 115,
128 (1980) ("The person invoking the privilege must have some objectively reasonable cause to
perceive some real danger of prosecution that would result if she answers the question asked of
her. This perception must be real and not imaginary or fanciful."); *Martin-Trigona v. Gouleta*,
634 F.2d 354, 360 (7th Cir. 1980) ("the pendency of criminal proceedings does not by itself
excuse a witness of his obligation to give testimony in civil proceedings. Some nexus between
the risk of criminal conviction and the information requested must exist."); *In Re High Fructose
Corn Syrup Antitrust Litigation*, 295 F.3d 651, 663-664 (7th Cir. 2003).

## V.    The Admission of Plaintiff's 11 Alias Names Was Unfairly Prejudicial and Should Not Have Been Allowed

The Court denied Plaintiff's motion *in limine* to bar reference to Mr. Thompson's use of
alias names. Ex. A at 34-39. Not only were the Defendants allowed to bring in that Mr.
Thompson gave the Defendants an alias name during the arrest at issue in this case, but also ten

---

[13]    Defense counsel also improperly told the jury that Mr. Thompson had invoked his right to not
testify at the criminal trial. Ex. I at 4.

other aliases used during other arrests. Allowing this evidence effectively circumvented the Court's ruling barring any reference to Plaintiff's prior arrests. *See* Ex. A at 28 (barring reference to prior arrests).

Although the questions did not specifically reference arrests, that fact was patently obvious from the questioning regarding the different names, different spellings of his names, and different dates of birth used on "many important occasions in [his] life." *See* Ex. E at 26. For each and every alias name and wrong date of birth used, counsel asked on cross examination whether it was used "during an important event in your life." *See* Ex. E at 27-30. Further, that the names were used during other arrests was obvious from the fact that one of the names was that used during the arrest at issue in this case (*id.* at 30), as well as from the fact that Mr. Thompson was a drug user (*id.* at 25) with a felony conviction (*id.* at 31) who had spent six years in prison before (*id.* at 23) and had run from the police on other occasions (*id.* at 43), all of which came into evidence over Plaintiff's strenuous objections.[14]

The Court allowed this testimony pursuant to Rule 608(b) as specific instances of conduct demonstrating character for truthfulness. *See* Ex. A at 36-37. Even specific instances of untruthfulness, however, are subject to the Rule 403. Here the probative value of the alias names (and, certainly of all of the alias names as opposed to limiting the evidence to that used during events in September 2002) was heavily outweighed by the enormous prejudicial effect to Plaintiff. *See United States. v. Toma*, 1995 WL 65031, at *4 (N.D. Ill. Feb. 13, 1995) (excluding alias names as "such evidence is not admissible simply to create the impression that the defendant is unsavory or a criminal"). *See also United States v. Finley*, 708 F.Supp. 906, 911 n.3

---

[14] Plaintiff had filed motions *in limine* on all of these subject matters and they were all denied. *See* Ex. A, transcript of hearing. During Mr. Thompson's testimony Plaintiff fronted many of these issues in order to try to at least somewhat minimize their prejudicial effect, but Plaintiff did so subject to the objections and the Court's overruling of those objections.

(N.D. Ill. 1989) (upholding government's objection to impeaching government witness solely on the basis that he used an alias).

The recitation of the alias names was effectively a recitation of Plaintiff's criminal record, but leaving the jury free to speculate as to the crimes charged. This evidence alone was so highly prejudicial that it was unlikely for Plaintiff to receive any fair assessment of whether or not the officers pursued the charges against him without probable cause. As the Third Circuit has explained:

> A classic example of unfair prejudice is a jury's conclusion, after hearing a recitation of a defendant's prior criminal record, that, since the defendant committed so many other crimes, he must have committed this one too. This is an improper basis of decision, and the law accordingly prohibits introduction of prior convictions to demonstrate a propensity to commit crime. F.R.E. 404.

*Carter v. Hewitt*, 617 F.2d 961, 972 (3rd Cir. 1980); *See also Anderson v. Sternes*, 243 F.3d 1049, 1054 (7th Cir. 2001) ("The law is clear that a defendant's prior arrest record is inadmissible, and while the reference to Anderson's past arrest was only indirect, it was still improper").

The unfair prejudice of this evidence vastly outweighed its probative value. At the most, this evidence should have been limited to the one alias used on the date of the arrest. Allowing the litany of alias names and dates of birth, spanning four pages of the trial transcript, was far to prejudicial, especially in a case involving the question of whether Defendant police officers acted in accordance with the constitutional protections in arresting and criminally charging Mr. Thompson. *See Geitz v. Lindsey*, 893 F.2d 148, 151 (7th Cir. 1990) ("We are mindful of our duty to ensure that this class of civil rights plaintiffs are not unfairly prejudiced by the use of their criminal pasts against them").

## Conclusion

Far from the kind of blanket rulings that are more typically the basis of Rule 59 motions regarding evidentiary rulings, this Court fastidiously assessed each of the many evidentiary disputes raised by the parties. In four days of pre-trial conference, as well as many more hours before, after, and during in each of the four trial days, the Court weighed the probative value of each piece of disputed evidence against its potential for prejudice and delay. In these meticulous assessments, however, too much consideration was given to any risk of prejudice to the Defendants at the expense of highly probative evidence necessary to Plaintiff's claims.

Instead of following the careful evidentiary rulings, defense counsel used improper questioning of witnesses to make a highly improper and suggestive argument to the jury. That improper argument, in combination with evidentiary rulings that ultimately excluded all of the substantive evidence against Defendants McDermott and Burzinski, detrimentally affected the trial of Plaintiff's claims against these two defendants. The result was that the jury was left with only one reasonable—but mistaken—impression: that Defendant Suchocki was the "bad apple." The suggestion was that as a result of Suchocki's (and, perhaps Finnigan's) unrelated misconduct the other officers were forced to assert their Fifth Amendment rights, but those assertions were meaningless. This argument was highly improper and severely prejudicial to Plaintiff.

WHERERFORE Plaintiff respectfully requests that this Honorable Court enter an order pursuant to Federal Rule of Civil Procedure 59 for a new trial on the due process, conspiracy and failure to intervene claims against Defendants McDermott and Burzinski and on the malicious prosecution claim against all Defendants and that evidence of plaintiff's alias names be excluded from the new trial

RESPECTFULLY SUBMITTED,


_____/s/ Amanda Antholt_____
One of the Attorneys for Plaintiff


Christopher R. Smith
Robert W. Johnson
Amanda Antholt
Smith, Johnson & Antholt, LLC
112 S. Sangamon St., 3rd Floor
Chicago, IL  60607
(312) 432-0400

David A. Cerda
Cerda Law Office
440 North Wabash Avenue
Suite 4905
Chicago, Illinois 60611-7690
(312) 467-9100